UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

IN RE GRAND JURY SUBPOENAS   M.B.D. NO.
TO GMB CAPITAL MANAGEMENT, L.L.C. 12-91187-JLT
AND GMB CAPITAL PARTNERS, LLC.  **FILED UNDER SEAL**

**REPORT AND RECOMMENDATION RE:
PETITIONER'S MOTION TO COMPEL PRODUCTION
OF DOCUMENTS AND OTHER EVIDENCE
(DOCKET ENTRY # 1)**

**March 11, 2013**

**BOWLER, U.S.M.J.**

Pending before this court is a motion to compel filed by petitioner United States of America (the "government"). (Docket Entry # 1). On August 9, 2012, GMB Capital Management, L.L.C. ("GMB Management") and GMB Capital Partners, LLC ("GMB Partners") (collectively "GMB") filed an opposition. (Docket Entry # 5). On November 20, 2012, this court heard oral arguments and took the matter under advisement.

In January 2013, this court ordered GMB to produce the documents for *in camera* review[1] and limited the submission to the

---

[1] The Supreme Court has held that a court may receive contested documents *in camera* if there is a "factual basis adequate to support a good faith belief by a reasonable person" that the crime-fraud exception applies. United States v. Zolin, 491 U.S. 554, 572 (1989) (internal quotation marks and citations omitted); accord United States v. Schussel, 2008 WL 3983887, at *10 (1st Cir. Aug. 29, 2008). As the First Circuit noted, "it is often hard to determine whether the attorney-client relationship has been misused . . . without seeing the document, or hearing

privileged communications made during the 2009 Securities and
Exchange Commission ("SEC") examination that relate to the three
areas identified in the government's motion.  (Docket Entry ## 33
& 36).  Having conducted an in camera review, the motion is now
ripe for review.

<u>BACKGROUND</u>

The government and a grand jury are investigating GMB,
Gabriel Bitran and Marco Bitran (collectively "the Bitrans")
"for, among other things, securities fraud arising from the
marketing of certain hedge funds and investment advisory services
as well as false statements and obstruction during the SEC's
examination of GMB."  (Docket Entry # 2, p. 1).  During this
investigation, GMB and the Bitrans, through counsel, have
withheld certain documents and information on the grounds of
attorney client privilege.  (Docket Entry # 5, pp. 14 & 19).

Gabriel Bitran, a professor at the Sloan School of
Management at Massachusetts Institute of Technology, founded GMB
Management in May 2005 with the assistance of his son Marco
Bitran.  (Docket Entry # 5, p. 2).  Marco Bitran left full time
employment with Wellington Capital Management to join his father
to manage hedge funds at GMB Management.  (Docket Entry # 5, pp.
2-3; Docket Entry # 2, p. 2).  GMB Management marketed its hedge

_____

the testimony, as to which the privilege is claimed."  <u>In re</u>
<u>Grand Jury Proceedings</u>, 417 F.3d 18, 22 (1st Cir. 2005).

funds to investors by emphasizing the use of a quantitative optimal pricing model ("the Model") developed in connection with Gabriel Bitran's academic research. (Docket Entry # 5, pp. 3-4; Docket Entry # 2, p. 2). The marketing materials included historical pre-inception data from 1998 to 2005 of investments made on behalf of Gabriel Bitran's family and friends using the Model. (Docket Entry # 5, p. 4; Docket Entry # 2, p. 2). Communications to investors also referenced this pre-inception data with representations that GMB's strategy resulted in an average annual return of over 20% since 1998 without any losses over any calendar year. (Docket Entry # 3, Ex. 9-11). GMB Management later registered with the SEC in the fall of 2007 as an investment advisor. (Docket Entry # 2, p. 4).

In April 2008, Marco Bitran separately founded and ran GMB Partners, an unregistered investment company established to take ownership and control of all GMB's hedge funds. Thereafter, Gabriel Bitran independently ran GMB Management, which functioned only as an investment advisor. (Docket Entry # 5, p. 3). In the fall of 2008, a number of GMB hedge funds experienced a series of losses. (Docket Entry # 2, p. 4).

On January 21, 2009, the SEC began an examination of GMB Management and issued requests for the production of documents. (Docket Entry # 2, p. 5). GMB Management responded to the SEC's requests through its counsel, Daniel Viola, Esq. ("Attorney

3

Viola") of Sadis & Goldberg LLP.  (Docket Entry # 2, p. 5).

Among the documents that GMB produced in response to the SEC's

requests were trade logs that reflected the purchases and sales

of securities from late 1997 to August 2005 using two GMB

investment strategies ("Trade Logs").  (Docket Entry # 2, p. 5).

During the examination, Attorney Viola regularly communicated

with the Bitrans and three SEC examiners via email and telephone.

(Docket Entry # 5, p. 5).  On March 31, 2010, the SEC issued a

letter to GMB Management detailing deficiencies identified in the

examination.  (Docket Entry # 3, Ex. 27).  GMB Management

responded to the deficiency letter (Docket Entry # 3, Ex. 28) and

produced documents in response to subpoenas from the SEC, but

also withheld and redacted documents based on attorney client

privilege.  (Docket Entry # 2, p. 6).

On November 30, 2011, a federal grand jury issued subpoenas

to GMB in connection with the current investigation.  (Docket

Entry # 3, Ex. 29(a)-(c)).  A response from GMB's current

counsel, Dana McSherry, Esq. ("Attorney McSherry") of McDermott

Will & Emery LLP, withdrew some of GMB's privilege claims and

continued to redact and withhold other documents on grounds of

privilege.  (Docket Entry # 3, Ex. 30).

In April 2012, GMB and the Bitrans reached a settlement with

the SEC in connection with its findings that GMB and the Bitrans

made misrepresentations to investors and provided SEC examiners

with false records.  (Docket Entry # 3, Ex. 31).  The SEC issued

a cease and desist order making findings and imposing remedial

sanctions.  (Docket Entry # 3, Ex. 31).  The sanctions against

GMB and the Bitrans included payment of $4.8 million to the SEC

and a permanent bar from the securities industry.  (Docket Entry

# 3, Ex. 31, pp. 10-13).  GMB and the Bitrans do not admit or

deny the SEC's findings.  (Docket Entry # 3, Ex. 31, p. 2).

The government served GMB with identical copies of the

November 2011 subpoenas on June 13, 2012.  (Docket Entry # 3, Ex.

29(d)-(f)).  GMB continues to assert claims of attorney client

privilege and has not produced any further documents responsive

to the reissued subpoenas.  (Docket Entry # 3, Ex. 45; Docket

Entry # 2, p. 6 n.1).

## DISCUSSION

The government seeks to compel the production of documents

responsive to the two reissued grand jury subpoenas served to GMB

Management and GMB Partners on June 13, 2012, specifically all

"documents evidencing or concerning GMB's preparation of its

response[s] to the SEC's examination beginning in January 2009

and up to the sending of the deficiency letter on March 31,

2010." (Docket Entry # 16, p. 7). The government contends that

the allegedly privileged documents are subject to:  (i) the

crime-fraud exception because GMB used its relationship with its

attorney to carry out fraud and obstruction; and (ii) a third

party disclosure exception because communications between GMB and
its attorneys were made with the intent of being disclosed to the
SEC and are therefore not confidential.  (Docket Entry # 2, p.
7).

I.  <u>Attorney Client Privilege and Crime-Fraud Exception</u>

The attorney client privilege protects communications made
in confidence between attorney and client in connection with the
seeking of legal advice by the client.  <u>See</u> <u>Upjohn Co. v. United</u>
<u>States</u>, 449 U.S. 383, 389 (1981).  The purpose of the privilege
is "to encourage full and frank communication between attorneys
and their clients and thereby promote broader public interests in
the observance of law and administration of justice."  <u>Id.</u>;
<u>accord</u> <u>Cavallaro v. United States</u>, 284 F.3d 236, 245 (1st Cir.
2002).  This privilege is well established as one of "the oldest
of the privileges for confidential communications known to the
common law."  <u>Upjohn Co. v. United States</u>, 449 U.S. at 389.
There is, however, a doctrine of construing the privilege
narrowly since "[t]he investigation of truth and the enforcement
of testimonial duty demand the restriction, not the expansion, of
these privileges."  <u>Cavallaro v. United States</u>, 284 F.3d at 246
(quoting 8 J.H. Wigmore, <u>Evidence</u> § 2192, at 73 (McNaughton rev.
1961)).

The crime-fraud exception is one of several qualifications
to the attorney client privilege.  <u>In re Grand Jury Proceedings</u>,

6

417 F.3d at 22.   The exception removes protection for attorney client communications made in furtherance of a crime or fraud. Id.   The rationale for the exception is that "[u]sing the privilege to hinder proof of fraudulent or criminal activity would . . . undermine th[e] core purpose" of the attorney client privilege.   In re Grand Jury Proceedings (Violette), 183 F.3d 71, 75 (1st Cir. 1999) (internal citations omitted).   This justification is a judgment that "statements made in furtherance of a crime or fraud have relatively little (if any) positive impact on the goal or promoting the administration of justice." Id. at 76.

The party invoking the crime-fraud exception must present evidence "'(1) that the client was engage[ed] in (or was planning) criminal or fraudulent activity when the attorney-client communications took place; and (2) that the communications were intended by the client to facilitate or conceal the criminal or fraudulent activity.'"   In re Grand Jury Proceedings, 417 F.3d at 22 (quoting In re Grand Jury Proceedings (Violette), 183 F.3d at 75); accord United States v. Albertelli, 687 F.3d 439, 450 (1st Cir.) cert. denied 133 S.Ct. 566 (2012); United States v. Schussel, 2008 WL 3983887, at *8; Chevron Corp. v. Shefftz, 754 F.Supp.2d 254, 266 (D.Mass. 2010).   The client's intent controls; it does not matter whether the attorney was aware of the client's purpose.   In re Grand Jury Proceedings (Violette), 183 F.3d at 79

(internal citations omitted); In re Grand Jury Proceedings, 417
F.3d at 23 ("forfeiture of the privilege requires the client's
*use or aim to use* the lawyer to foster the crime or the fraud")
(emphasis in original); Chevron Corp. v. Shefftz, 754 F.Supp.2d
at 266 (client's intent and use of attorney controls).  The
privilege is forfeited if the client used the attorney "'to
enable or aid the client to commit what the client knew or
*reasonably should have known* to be a crime or fraud.'"  In re
Grand Jury Proceedings, 417 F.3d at 24 (quoting United States v.
Rakes, 136 F.3d 1, 4 (1st Cir. 1998)) (emphasis added).

To apply the crime-fraud exception requires a "reasonable
basis" to find that the attorney was used by the client to
facilitate a crime or fraud.[2]  In re Grand Jury Proceedings, 417
F.3d at 23; accord United States v. Schussel, 2008 WL 3983887, at
*9; Chevron Corp. v. Shefftz, 754 F.Supp.2d at 267.  This allows
"piercing of the privilege on something less than a mathematical
(more likely than not) probability that the client intended to
use the attorney in furtherance of a crime or fraud."  In re
Grand Jury Proceedings, 417 F.3d at 23.  While this standard is
meant to be "reasonably demanding," the requirements cannot be

---

[2]  Case law also describes the standard as a "prima facie"
showing.  Thus, "although [the circuits are] divided on
articulation," all effectively allow piercing the privilege when
there is a "reasonable basis to believe the lawyer's services
were used by the client to foster a crime or fraud."  In re Grand
Jury Proceedings, 417 F.3d at 23 (internal citations omitted).

too high because it is difficult for "an adversary unaided to
show that the privileged communications were themselves corrupt."
Id.  The reasonable basis standard does not require a
determination by the court that the client actually committed any
fraud or crime.  Id. at 21.  When deciding whether to apply the
crime-fraud exception, a court is "limited solely to the issue
[of] whether there is reasonable cause adequate to pierce [the]
privilege." Id. at 24.  The assessment of the available evidence
is "*preliminary* and does not reflect a finding that a client
acted wrongfully." United States v. Schussel, 2008 WL 3983997,
at *9 (emphasis added).  In fact, "The crime-fraud exception may
apply...even if the client is ultimately found not to be guilty."
Id.

The reach of the crime-fraud exception is not all
encompassing; it only removes protection for attorney client
communications *made in furtherance* of a crime or fraud.  In re
Grand Jury Proceedings, 417 F.3d at 22 (emphasis added); accord
In re Grand Jury Subpoena, 419 F.3d 329, 343 (5th Cir. 2005)
(application of crime-fraud exception does not extend to all
attorney client communications).  The exception is applied to
communications where a reasonable basis has been established to
believe the client used his or her attorney to facilitate a crime
or fraud in those instances.  See In re Grand Jury Proceedings,
417 F.3d at 22; Chevron Corp. v. Shefftz, 754 F.Supp.2d at 267

(exception does not apply if there is no evidence of knowing participation in a fraud).  For example, the First Circuit in <u>In re Grand Jury Proceedings</u> compelled the testimony of an attorney as to "Client B" but not to "Client C" because the government failed to present any evidence that "Client C" used its counsel to facilitate a crime or fraud.  417 F.3d at 23-24; <u>see</u> <u>also</u> <u>In re Grand Jury</u>, 2012 WL 6156176, at *1-2 (3rd Cir. Dec. 11, 2012) (affirming trial court's order to compel only communications "used in furtherance of an ongoing or future crime"); <u>In re Grand Jury Investigation</u>, 445 F.3d 266, 280 (3rd Cir. 2006) (noting lower court properly tailored order to compel only communications implicated by crime-fraud exception).

The government contends that the available evidence shows that GMB used its attorneys to communicate false statements and false or misleading records to the SEC, which sufficiently satisfies the reasonable basis standard for the piercing of GMB's privilege claims.  (Docket Entry # 2, p. 7).  The Government frames its argument around three "material lies" to provide the court with a reasonable basis to believe GMB used its counsel to facilitate a fraud or crime:  (1) the Trade Logs were contemporaneous records of actual trades; (2) Gabriel Bitran did not find any GMB email correspondence with clients and/or potential clients during the period August 29, 2007 through December 31, 2008; and (3) Gabriel Bitran was not involved in GMB

Partners after the legal separation of GMB Management and GMB
Partners.  (Docket Entry # 2, pp. 10-16).  GMB emphasizes the
sanctity of the attorney client privilege and insists that any
inaccuracy in its responses to the SEC were the result of
miscommunications and does not amount to a crime or fraud.
(Docket Entry # 5, p. 2).

    1.  <u>Trade Logs</u>

On April 13, 2009, the SEC sent Request 8.8 to GMB
Management.  The Request asked for "supporting performance
results for claim in email that 'there have never been any down
years since 1998.'"  (Docket Entry # 5, Ex. 24).  GMB Management
responded through Attorney Viola with a one page response that
stated Gabriel Bitran invested his own personal and family money
starting in 1998 and provided a table of self-prepared figures to
support the pre-inception performance results.  (Docket Entry #
5, Ex. 25-26).  With only this self-prepared table of figures in
hand, the SEC issued Request 10.6 on April 30, 2009 asking GMB
Management to put in writing that it did not maintain books and
records to substantiate the claims of no down years since 1998.
(Docket Entry # 5, Ex. 27).  In response, Attorney Viola sent a
series of five emails on May 6, 2009, attaching brokerage records
going back to October 2005 (Docket Entry # 5, Ex. 28) and the
Trade Logs (Docket Entry # 5, Ex. 29).

The Trade Logs show the monthly performance of two GMB strategies covering the period from approximately December 1997 through August 2005. (Docket Entry # 5, Ex. 29). All buy and sell dates of shares occurred only on the last business day of a given month. (Docket Entry # 5, Ex. 29). In the two days prior to the production of the Trade Logs, email correspondence between Gabriel Bitran and Marco Bitran show the exchange and revision of spreadsheets containing the same performance results represented in the Trade Logs. (Docket Entry # 5, Ex. 31-34). The early drafts exchanged between the Bitrans did not contain any records of particular trades (Docket Entry # 3, Ex. 32-34), but sections purporting to represent the buy and sell dates of trades were later added (Docket Entry # 3, Ex. 35). Thirty three minutes after receiving a copy of the Trade Logs from Marco Bitran (Docket Entry # 3, Ex. 37), Attorney Viola forwarded a copy to the SEC. (Docket Entry # 3, Ex. 21).

In Request 15.3, submitted after receipt of the Trade Logs, the SEC explicitly asks whether these performance claims are from "actual (traded) investment accounts or modeled accounts?" (Docket Entry # 5, Ex. 35 at GMB00004494). This question makes clear that the SEC was asking whether the pre-inception data was based on actual cash trades or simulated "paper" trades. The next day, Attorney Viola resent the series of five emails with the brokerage statements and Trade Logs, writing that these are

"for actual trading accounts." (Docket Entry # 5, Ex. 36).

After further pressing by the SEC examiners, two weeks later,

Attorney Viola sent a supplemental response describing how the

Trade Logs were calculated and what they represent. (Docket

Entry # 5, Ex. 37). This supplemental response specifically

states that the "data shown is *not back-tested*[3] and is in fact a

record reflecting the trading performance . . . in personal

accounts over time. Gabriel *in fact* traded these strategies

going back well before 1998. The trades were recorded in *real-

time*." (Docket Entry # 5, Ex. 37) (emphasis added).

   GMB thus consistently represented that the Trade Logs are a

contemporaneous record of actual trades that were not back-

tested. (Docket Entry # 5, Ex. 36-37; Docket Entry # 3, Ex. 23 &

25). GMB now points to an August 10, 2009 email from Attorney

Viola to assert that Attorney Viola made clear the Trade Logs

included data from actual cash trades and real time simulated

trades. (Docket Entry # 5, p. 7). The August 10th email,

however, merely states that the Trade Logs were simultaneous

records of real time trades from 1998 to early 2006, containing

all the critical information a brokerage statement would provide.

(Docket Entry # 5, Ex. 38). The email briefly describes how the

FastTrack system Gabriel Bitran used for the pre-inception trades

---

   [3] Back-testing is the process of applying a trading
strategy using simulated trades on relevant, historical past data
in order to assess its effectiveness. (Docket Entry # 5, Ex. 46.

computed dividends.  (Docket Entry # 5, Ex. 38).  Attorney Viola also clarifies that any pre-August 2006 data in marketing communications were labeled as "friends and family" and "unaudited" to qualify the performance.  (Docket Entry # 5, Ex. 38).  This email never once states the pre-inception data is based, in whole or in part, on hypothetical trades.

GMB's emphatic declaration that Attorney Viola made clear to the SEC, via telephone and email communications, that pre-inception data (including the Trade Logs) were not actual trades is not supported by the available evidence.  GMB merely speculates as to what Attorney Viola told the government during his May 18, 2012 interview during the grand jury investigation.[4] (Docket Entry ## 5-6).  The SEC made it apparent in its cease and desist order that GMB Management held out its Trade Logs to the SEC examiners as real time logs of actual trades.  These representations and records were found to be false.  (Docket Entry # 5, Ex. 39, p. 9).

The marketing materials and solicitations to investors also support the finding that GMB misrepresented its pre-inception data as performance of actual trades using real money.  The

---

[4]  As Attorney Viola's May 18, 2012 interview was a confidential interview conducted during the course of a grand jury investigation, GMB cannot be faulted for any mistakes as to what it believes occurred.  GMB, however, heavily relies on speculation of what occurred in the interview for its arguments and conclusions in its various briefs.

representations made to investors and whether they were misled

was the crux of the SEC's initial inquiry for support of GMB's

pre-inception performance.   GMB now suggests that its disclosures

and communications to investors "clearly stated that the pre-

inception performance figures were based on

hypothetical/simulated trades."[5]   (Docket Entry # 5, p. 8).   GMB

references marketing material from January, April and September

2009, which describes the pre-inception data as "pro forma,"

"unaudited," "hypothetical and simulated" and the result of back-

testing.   (Docket Entry # 5, Ex. 20 & 46-47).   These disclosures

only clearly indicate the pre-inception data as hypothetical and

back-tested after the SEC began its investigation in January

2009.

   The 2009 marketing disclosures conflict with a myriad of

prior marketing material and correspondence with potential

investors.[6]   For example, a December 2006 presentation contains a

_____

   [5]   In its opposition brief, GMB also concedes that the
"Trade Logs are plainly not logs of actual cash trades."   (Docket
Entry # 5, p. 7 n.2).

   [6]   For example, in a February 20, 2007 email from Marco
Bitran to potential investors, he represents that GMB has "used
quant [sic] models since 1998 to manage friends and family
assets" without any clarification these were simulated, non-cash
trades.   (Docket Entry # 3, Ex. 2(b)).   A January 2007
presentation only footnoted pre-inception data as "operated as
Friends and Family Managed Accounts" without other disclosures.
(Docket Entry # 3, Ex. 3).   A January 2008 performance sheet and
presentation packet only discloses the data as "unaudited" and
continues use of the "Friends and Family Managed Accounts"

table of figures entitled "Net <u>Actual</u> Performance of Friends and Family Managed Accounts." (Docket Entry # 3, Ex. 2(a), p. 13) (emphasis in original). A March 2006 email from Marco Bitran to Gabriel Bitran attaches a presentation script that represents GMB strategies have "returned 23% per year over the last eight years, without a single down calendar year, with *real money*." (Docket Entry # 3, Ex. 5, GMB-E 0102160) (emphasis added).

The 2009 disclosures and GMB's opposition brief directly contradict GMB's prior marketing material and written responses to SEC Request 15.3. In one response, GMB describes the data as "not back-tested" and "recorded in real-time." (Docket Entry # 5, Ex. 37). In addition, a July 10, 2009 email from Gabriel Bitran to Marco Bitran indicates awareness of having misled investors:

> We have mislead [sic] a lot of people with a range of statements that were incorrect simply to increase our income. We paid and are paying dearly for that. A person with the experience and knowledge of the financial sector and a veteran professor of MIT should not have engaged in this type of behavior . . . They are not idiots, they know they were mislead [sic]. The penalty for this type of action is [f]ull restitution, which obviously we cannot afford.

---

language. (Docket Entry # 3, Ex. 9). In July and August 2008 materials, GMB changed the footnote and disclosures to indicate the pre-inception figures as "unaudited" and "pro forma" and removed the friends and family language. (Docket Entry # 3, Ex. 11). These "key" disclosure words were used in isolation and would not have alerted a potential investor that GMB's pre-inception performance was based on hypothetical, back-tested trades.

(Docket Entry # 16, pp. 10-11).   While this communication was
between the Bitrans and not made through Attorney Viola, GMB
incorrectly characterizes this email exchange as irrelevant to
the motion before this court.   This email is one of many
documents reviewed by this court that supports a reasonable basis
to believe that GMB and the Bitrans may have "knowingly" misled
investors and therefore submitted false and misleading responses
to the SEC through counsel.

    2.   <u>Gabriel Bitran Did Not Find Any GMB Client</u>

<u>Correspondence</u>

    GMB Management failed to produce any emails from Gabriel
Bitran in response to the SEC's request covering the period from
August 29, 2007 through December 31, 2008, for:

> E.   Client Correspondence and/or Complaints
>
> 1.   Any client complaints, and information about the process
> used for monitoring client correspondence and/or complaints,
> including the name of any third-party service provider used
> and the Adviser's oversight of the service provider.
>
> 2.   All emails and instant messages pertaining of [sic] the
> Adviser's employees or principals.

(Docket Entry # 3, Ex. 39, p. 3).   In response to the request,
Attorney Viola forwarded an email drafted by Gabriel Bitran that
stated:   "Dan, during the examination period I (Gabriel Bitran)
did not use email as his [sic] primary method of communication.
I do not recall sending emails and *no such emails were found
during the period*."   (Docket Entry # 3, Ex. 26) (emphasis added).

17

Approximately 1,850 emails related to GMB in which Gabriel Bitran appeared as either a sender or recipient during the relevant examination period were produced to the government. (Docket Entry # 5, p. 10).  While Gabriel Bitran's representation that he did not use email as his *primary* method of communicating with clients may be true,[7] it is bewildering how he thought he did not have a single email responsive to the request during the 16 month period specified by the SEC.  In response to SEC subpoenas, GMB Management then produced emails responsive to the SEC's initial request for client correspondence.[8]  (Docket Entry # 3, Ex. 31, p. 9).  Attorney McSherry's review of the email production to the government revealed approximately 148 emails responsive to the SEC's request.  (Docket Entry # 5, p. 10). This extensive number of emails belies and renders highly suspect Gabriel Bitran's representation of not recalling and not finding any emails during the designated time period.  A further review by Attorney McSherry of a second production of emails to the Government also revealed at least 28 more emails from Gabriel

---

[7]   Attorney McSherry's initial review of the approximately 1,850 emails produced to the government indicated that less than eight percent were client communications.  (Docket Entry # 5, p. 10).

[8]   The SEC found that GMB Management submitted a false statement to the SEC, through Attorney Viola, regarding Gabriel Bitran's client correspondence.  (Docket Entry # 3, Ex. 31, p. 9).

Bitran to a client and/or prospective client.[9] (Docket Entry # 26, ¶ 4).

GMB contends that the emails do not render Gabriel Bitran's statement that he "did not use email as his primary method of communication" false and would not amount to a crime or fraud. (Docket Entry # 30, p. 2). GMB, however, incorrectly focuses on the "primary method of communication" part of Gabriel Bitran's response to the SEC and overlooks his failure to find and produce *any* emails responsive to the SEC's request.

3. Gabriel Bitran's Role after Division of GMB

In Request 2.2, the SEC asked GMB Management to describe the history of the firm, why GMB Partners was separated from GMB Management and how clients and assets were separated. (Docket Entry # 3, Ex. 41). GMB Management's response was a two page timeline of the firm's history. (Docket Entry # 3, Ex. 7). After the SEC pressed for more information, GMB Management told the SEC, through Attorney Viola, that, "Gabriel and Marco separated the business effective on May 12, 2008 and Gabriel does not have any control or ownership of GMB Capital Partners." (Docket Entry # 3, Ex. 13). The response also indicated that,

---

[9] The government maintains there was additional email correspondence between Gabriel Bitran and clients responsive to the SEC's request, including client complaints and disputes, not attached to Attorney McSherry's supplemental declaration containing the 28 client emails. (Docket Entry # 28).

"[Gabriel] does not have any alternative fund/hedge fund
clients." (Docket Entry # 3, Ex. 13).

After the May 2008 separation, Gabriel Bitran continued to
have an active role with GMB Partners' investors and clients.
GMB contends that Gabriel Bitran "was necessarily referenced in
marketing materials and involved in client communication" as
creator of the Model used by GMB Partners.  (Docket Entry # 5, p.
11).  Gabriel Bitran, however, was held out as more than just the
creator of the quantitative trading model.

GMB Partners' marketing presentations from June and July
2008 explicitly describe Gabriel Bitran as Chief Investment
Officer.  (Docket Entry # 3, Ex. 10-11).  Correspondence from
September and October 2008 also names Gabriel Bitran as Chief
Investment Officer of GMB Partners.  (Docket Entry # 3, Ex.
14(a)-(c)).  A January 2009 letter to stakeholders of GMB
Partners was also signed by both Bitrans.  (Docket Entry # 3, Ex.
15).  GMB Partners also represented that Gabriel Bitran had an
active role in GMB Partners' trading activities.[10]  Contrary to
GMB's assertions that the SEC "[e]xaminers were well aware of
Gabriel's connection to partners as the creator of the Model and
were not misled" (Docket Entry # 5, p. 12), Gabriel Bitran was

---

[10]  A July 2008 email listing several marketing points, in
connection with a particular GMB fund, represents that, "Marco
and Gabriel sign off on trades, [sic] look at it every day."
(Docket Entry # 3, Ex. 8, p. 2).

featured prominently in GMB Partners' marketing as being an active manager of funds and the Chief Investment Officer, which the SEC found to be materially misleading to potential investors. (Docket Entry # 3, Ex. 31, pp. 6-7).

In sum, the aforementioned evidence is sufficient to meet the reasonable basis standard to apply the crime-fraud exception. Although this preliminary review does not draw any conclusion about actual wrongful behavior by GMB or the Bitrans, the available evidence[11] supports a reasonable basis to believe:  (1) the pre-inception data represented in the Trade Logs were back-tested, hypothetical trades not made in real time; (2) Gabriel Bitran knowingly failed to produce any GMB client email correspondence requested by the SEC; and (3) Gabriel Bitran's involvement with GMB Partners after its legal separation from GMB Management was misrepresented to investors and SEC examiners.  As such, the Government has demonstrated a reasonable basis for this

---

[11]   This includes review of the Government's ex parte submissions to this court.  (Docket Entry ## 17 & 31).  GMB questions the ex parte nature of the filings (Docket Entry # 20, p. 2), however, the First Circuit has noted that ex parte submissions have precedent in grand jury matters and privilege claims.  In re Grand Jury Proceedings, 417 F.3d at 20 (internal citations omitted).  While GMB may contend that the Government's citing of grand jury secrecy is a "rote incantation" (Docket Entry # 20, p. 2), the Supreme Court has held that the "proper functioning of our grand jury system depends upon the secrecy of grand jury proceedings." Rehberg v. Paulk, 132 S.Ct. 1497, 1509 (2012) (internal quotation marks and citations omitted); accord In re Grand Jury Matter, 607 F.Supp.2d 273, 274 (D.Mass. 2009) (citing Douglas Oil Co. of California v. Petrol Stops Northwest, 441 U.S. 211, 218 (1979)).

court to believe that GMB used its counsel to enable GMB to commit what it knew or reasonably should have known to be a fraud or a crime.  Futhermore, a review of each document withheld on the basis of the privilege and submitted for in camera review demonstrates either:  (1) the document is not privileged in the first instance; or (2) the requisite reasonable basis exists with respect to that document as to at least one of the three categories.[12]

This evidentiary showing by the Government, however, only removes the protection of attorney client privilege over GMB's communications with its counsel relating to the preparation of its responses to the three SEC requests outlined in the Government's motion:  (1) SEC Request 8; (2) SEC Request 10; and (3) SEC Request 15.[13]  Here, the Government has only provided evidence for the court to believe GMB, through its attorney, facilitated a crime or fraud in connection with these three

---

[12]   GMB conveniently grouped and tabbed the in camera documents into the requisite three categories.  For context, GMB also submitted non-privileged documents with GMB Bates prefix.

[13]   Documents relating to SEC Requests 8, 10 and 15 would be responsive to a specific document request in the reissued grand jury subpoenas.  The request reads as follows:

All documents evidencing or referring to preparation of the responses provided to the SEC Staff in response to the Information Requests to GMB Capital Management, L.L.C. dated April 13, 2009 [SEC Request 8], April 30, 2009 [SEC Request 10] and June 29, 2009 [SEC Request 15], including all drafts, computerized "meta" data for those responses.

(Docket Entry # 3, Ex. 29(d)-(e), Attach. A, Request 5).

specific SEC requests discussed above.  No other showing has been made by the government that it is entitled to all other GMB attorney client communications beyond these three areas.  This ruling avoids the need to address the government's alternative argument seeking production under the third party disclosure exception.

## II.   <u>Witnesses' Testimony</u>

As a final matter, the government requests this court to clarify that witnesses' testimony regarding certain communications, withheld based upon GMB's attorney client privilege, are subject to the crime-fraud exception.  The request in full reads as follows:

> Some witnesses have declined to testify or provide information about certain communications based upon GMB's attorney-client privilege.  The United States asks that this Court clarify that these communications, like the documents GMB has withheld, are subject to the crime-fraud exception and therefore a proper topic of inquiry and response.

(Docket Entry # 2, p. 7 n.2).[14]  Because this court finds that the crime-fraud exception applies as to the withheld documents relating to the three aforementioned SEC requests, a grand jury witness may not assert the privilege with respect to a withheld document and a related communication that involves that document.  In the event a dispute arises regarding the assertion of the

---

[14]    The government also submits excerpts of the testimony of one witness who it expects to recall.  (Docket Entry # 17, n.1 & Ex. CC).  At present, the government does not request a ruling with respect to this testimony at this point in time.

privilege on the part of a witness, the government may file a further motion including one seeking an in camera review.  See In re Grand Jury Proceedings, 417 F.3d at 25 (describing such a procedure).


<u>CONCLUSION</u>

In accordance with the foregoing discussion, this court **RECOMMENDS**[15] that the motion to compel (Docket Entry # 1) be **ALLOWED** as to the documents withheld as privileged during the 2009 SEC examination that relate to GMB's responses to SEC Requests 8, 10 and 15, including all drafts, computerized or "meta" data.  This court further **RECOMMENDS**[16] that the motion (Docket Entry # 1) be **ALLOWED** in part and **DENIED** in part to the extent set forth above with respect to witness testimony.


/s/ Marianne B. Bowler
**MARIANNE B. BOWLER**
United States Magistrate Judge

---

[15]    Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days of service of the Report and Recommendation to which objection is made and the basis for such objection.  See Rule 72(b), Fed. R. Civ. P.  Any party may respond to another party's objection within 14 days after service of the objections.

[16]    See the previous footnote.